IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| SHOWHOMES FRANCHISE COMPANY, LLC, | ) ) ) | |
| Plaintiff, | ) ) | NO. 3:25-cv-00982 |
| v. | ) ) | JUDGE RICHARDSON |
| MONICA ESTES, et al., | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is a "Motion for a Preliminary Injunction" (Doc. No. 6, "Motion") filed by Plaintiff, Showhomes Franchise Company, LLC ("Plaintiff" or "Showhomes"). Via the Motion, Plaintiff seeks to enjoin Defendant Monica Estes ("Defendant Estes"), Allyson Milley ("Defendant Milley"), MEAP Interiors, LLC ("Defendant MEAP"), and Main Line Design Studio LLC ("Defendant Mainline" and collectively with Defendant Estes, Defendant Milley and Defendant MEAP, "Defendants") "from violating the noncompete and post-termination and post-expiration provisions contained in the Franchise Agreements entered into between" Plaintiff and Defendant Estes, Defendant Milley and Defendant MEAP. (Doc. No. 6 at 1).[1] Plaintiff has filed an

---

[1] When the parties to this action refer collectively to the "Franchise Agreements," the Court discerns that they are referring to the "Showhomes Franchise Corporation Franchise Agreement," which was attached at Docket No. 7-2 as an exhibit to Plaintiff's Opening Brief in support of the Motion and referred to herein by the Court as the "First Franchise Agreement," and the (identically named) "Showhomes Franchise Corporation Franchise Agreement," attached as an exhibit at Docket No. 7-4 to Plaintiff's Opening Brief in support of the Motion and which the Court will refer to herein as the "Second Franchise Agreement." Following the parties' style, the Court herein will refer to the First Franchise Agreement and the Second Franchise Agreement collectively as the "Franchise Agreements."

opening brief (Doc. No. 7, "Opening Brief") in support of the Motion. Plaintiff's Opening Brief is supported by various documents—including the declaration of Plaintiff's President and CEO, Aurelio A. Salas (Doc. No. 7-1, "Declaration of Aurelio A. Salas").[2] Defendants have filed a response (Doc. No. 16, "Response") in opposition to the Motion. Defendants' Response is supported by various documents, including the declaration of Defendant Estes (Doc. No. 16-1 at 1-6). Finally, Plaintiff has filed a reply (Doc. No. 21, "Reply") in further support of the Motion, which is supported by a supplemental declaration of Aurelio Salas (Doc. No. 21-1). For the reasons described herein, the Motion (Doc. No. 6) is **DENIED**.

## BACKGROUND[3]

This action arises from alleged breaches of the Franchise Agreements by Defendants. (Doc. No. 1). Via its complaint, (Doc. No. 1, "Complaint") Plaintiff brings a single breach of contract claim based on (alleged) breaches of the Franchise Agreements by Defendants. (Doc. No. 1 at ¶¶ 58-65). Via the Complaint, Plaintiff seeks monetary, declaratory, and injunctive relief. (Doc. No.

---

Of note, at the time that the Franchise Agreements were entered into, Defendant Milley's last name was "Piccolomini." (Doc. No. 7 at 6 n.1). For clarity, the Court notes that it will refer to Defendant Milley by her (seemingly) current last name, "Milley," herein.

[2] Also in connection with the Motion, Plaintiff filed a proposed order at Docket No. 7-11 for the Court to enter in the event that the Motion is granted.

[3] The following facts, unless somehow qualified herein (as for example by "Plaintiffs allege that" or "Defendants assert that"), are taken as true for purposes of the Motion (though not necessarily for any future purposes in this litigation), because they are either: (1) asserted and evidentially supported at least to some degree by one party and not rebutted by the other side; (2) otherwise not in genuine dispute; (3) asserted and evidentially supported by one side to such an extent, or in such a manner, that they are credited by this Court even if rebutted to some extent by the other side; or (4) subject to judicial notice.
    As a corollary to the above, no facts alleged in the Complaint are accepted herein as true merely because they are alleged in the Complaint (even though they would be accepted as true on, for example, a motion to dismiss under Rule 12(b)(6). As for alleged facts that are *not* accepted as true (and thus are identified herein as merely alleged by Plaintiffs), they are not accepted as true precisely because they do not fall into one of these four categories. And as for *legal conclusions* asserted in the Complaint, none of them are accepted merely because they are asserted in the Complaint; on a motion for preliminary injunction, a court naturally accepts only legal assertions that the court independently finds to be meritorious.

1 at 14-15). The instant Motion is brought seeking somewhat narrower relief than the Complaint. Via the Motion, Plaintiff seeks to enjoin Defendants' (purported) ongoing breaches of the Franchise Agreements' post-termination and post-expiration non-competition covenants.

To describe the background to the instant Motion, the Court will first provide an overview of the parties to this action, then describe the provisions of the Franchise Agreements as relevant to the instant Motion, before analyzing the circumstances out of which the instant Motion arises and then providing a brief overview of the parties' arguments on the Motion.

1. The Parties

Plaintiff is "a Georgia limited liability company" that is "engaged in the business of franchising independent businesspersons to operate 'SHOWHOMES® businesses.'" (Doc. No. 1 at ¶ 1). Plaintiff "licenses independent businesspersons and businesses the right to operate SHOWHOMES® businesses throughout the United States, offering, among other things, home staging, decorating, interior updating, design, and furnishing services for residential properties." (Doc. No. 7 at 5).

Defendant Estes and Defendant Milley "previously owned and operated a Showhomes franchise in a territory in the area of Philadelphia, Pennsylvania" pursuant to the First Franchise Agreement, which was entered into on October 23, 2013, between Defendant Estes, Defendant Milley and Plaintiff. (Doc. No. 7-1 at ¶ 6; Doc. No. 16-1 at 2; Doc. No. 7-2 at 56).

Defendant MEAP "previously owned and operated a Showhomes franchise in a separate territory [from Defendant Estes and Defendant Milley] in the area of Philadelphia, Pennsylvania" pursuant to the Second Franchise Agreement, which was entered into on March 1, 2016, between Defendant MEAP and Plaintiff. (Doc. No. 7-1 at ¶ 10; Doc. No. 16-1 at 2). Defendant Estes and

Defendant Milley own Defendant MEAP, (Doc. No. 7-1 at ¶ 9), and also serve as guarantors of the Second Franchise Agreement. (Doc. No. 7-4 at 75).[4]

Defendant Mainline is a business owned by Defendant Estes and Defendant Milley that (according to Plaintiff) competes with Plaintiff. (Doc. No. 7 at 17; Doc. No. 7-1 at ¶¶ 11-13). Defendant Mainline also does business as "Shore Points Home Staging or Mainline Home Staging" (Doc. No. 7 at 9), two entities discussed further below.

2. The Franchise Agreements

As noted above, there are two franchise agreements (the Franchise Agreements) at issue in this case. The First Franchise Agreement was, as noted above, entered into on October 23, 2013, between Defendant Estes, Defendant Milley and Plaintiff. (Doc. No. 7-1 at ¶ 6; Doc. No. 16-1 at 2). The First Franchise Agreement had a ten-year initial term and also provided the franchisees (Defendant Estes and Defendant Milley) the right to renew the agreement. (Doc. No. 16-1 at 2; Doc. No. 7-2 at §§ 4.1, 4.2). As relevant here, the First Franchise Agreement included, among other things, certain non-competition covenants restricting the franchisees from engaging in certain conduct after the expiration or termination of the First Franchise Agreement. Specifically, under the First Franchise Agreement, Defendant Estes and Defendant Milley are restricted from, "for a period of two years [after the termination or expiration of the First Franchise Agreement], directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any other person or entity: (i) divert[ing], or attempt[ing] to divert, any business or customer of their franchised businesses to any competitor; or (ii) own[ing], maintain[ing], operat[ing], engag[ing] in, or hav[ing] any financial or beneficial interest in any business that offers services similar to the

---

[4] Given that Defendant Estes, Defendant Milley, and Defendant MEAP were at one point (and may still be) franchisees of Plaintiff, the Court will refer to these three defendants collectively at times as the "Franchisee Defendants" herein.

services offered by their franchised businesses, [that] is located, in relevant part, either within the territories of their Showhomes franchised businesses or within a 25-mile radius of those territories." (Doc. No. 7 at 8-9 (citing Doc. No. 7-2 at §§ 11.3.2.1, 11.3.2.3)).

The Second Franchise Agreement was, as noted above, entered into on March 1, 2016, between Defendant MEAP and Plaintiff. (Doc. No. 7-1 at ¶ 10; Doc. No. 16-1 at 2). The Second Franchise Agreement also had a ten-year initial term and provided the franchisee (in this case, Defendant MEAP) the right to renew the agreement. (Doc. No. 16-1 at 2; Doc. No. 7-4 at §§ 4.1, 4.2). As relevant here, the Second Franchise Agreement restricted the franchisee and its principals[5] (Defendant Estes and Defendant Milley) from, *during the Second Franchise Agreement's term*, "for themselves or through, on behalf of or in conjunction with any other person or entity: (i) divert[ing], or attempt[ing] to divert, any business or customer of their franchise to any competitor; or (ii) own[ing], maintain[ing], operat[ing], engag[ing] in, or hav[ing] any financial or beneficial interest in any business that offers services similar to the services offered by their franchised business." (Doc. No. 7 at 8 (citing Doc. No. 7-4 at §§ 11.3.1.1, 11.3.1.2)).[6]

The Second Franchise Agreement also included certain noncompetition covenants that provide that the franchisee (Defendant MEAP) and its principals (Defendant Estes and Defendant

---

[5] The Second Franchise Agreement defines "[p]rincipal" to mean "any person or entity who directly or indirectly owns an interest in Franchisee [(i.e., Defendant MEAP)]." (Doc. No. 7-4 at 10). As noted above, Defendant Estes and Defendant Milley are the owners of Defendant MEAP and thus appear to be principals of Defendant MEAP. The Court's conclusion on this point is buttressed by the fact that in its Opening Brief, Plaintiff asserts that Defendant Estes and Defendant Milley are the "Principals of Defendant MEAP Interiors, LLC and guarantors of its obligations under [the Second Franchise Agreement]" (Doc. No. 7 at 17)—an assertion that Defendants do not contest in their Response. Likewise, the Court's review of the Second Franchise Agreement does in fact show that Defendant Estes and Defendant Milley are guarantors of the Second Franchise Agreement, and that Defendant Estes is Defendant MEAP's "Managing Principal." (Doc. No. 7-4 at 75).

[6] The First Franchise Agreement contains similar provisions (Doc. No. 7-2 at §§ 11.3.1.1, 11.3.1.2), but these particular provisions in the First Franchise Agreement are not relevant to the instant Motion.

Milley) are restricted from, "for a period of two years [from the termination or expiration of the Second Franchise Agreement], directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any other person or entity: (i) divert[ing], or attempt[ing] to divert, any business or customer of their franchised businesses to any competitor; or (ii) own[ing], maintain[ing], operat[ing], engag[ing] in, or hav[ing] any financial or beneficial interest in any business that offers services similar to the services offered by their franchised businesses, [that] is located, in relevant part, either within the territories of their Showhomes franchised businesses or within a 25-mile radius of those territories." (Doc. No. 7 at 8-9 (citing Doc. No. 7-4 at §§ 11.3.2.1, 11.3.2.3)).[7]

The at-issue post-expiration and post-termination non-competition covenants in the First Franchise Agreement (Doc. No. 7-2 at §§ 11.3.2.1, 11.3.2.3) and the Second Franchise Agreement (Doc. No. 7-4 at §§ 11.3.2.1, 11.3.2.3) are identical, and at least one of either the First Franchise Agreement's or the Second Franchise Agreement's post-expiration and post-termination non-competition covenants are (at least theoretically)[8] enforceable against each Defendant for the

---

[7] The observant reader will note that Defendant Mainline is party to neither of the Franchise Agreements. Nevertheless, given that (as noted above) the post-expiration and post-termination covenants in the First Franchise Agreement and the Second Franchise Agreement apply to Defendant Estes and Defendant Milley, the Court understands that both of the Franchise Agreements' post-termination and post-expiration non-competition covenants are enforceable (to the extent these covenants are enforceable at all) against Defendant Mainline, also. *Total Car Franchising Corp. v. L&S Paint Works, Inc.*, 981 F. Supp. 1079, 1082 (M.D. Tenn. 1997) (competing business owned by the operator of former franchisee was also bound by the former franchisee's noncompete agreement "based upon established law in the area of injunctions and successor entities"). The Court's conclusion here is buttressed by the fact that Plaintiff, in its Opening Brief, contends that Defendant Mainline is bound by (each of) the Franchise Agreements' post-termination and post-expiration non-competition covenants (Doc. No. 7 at 17) and Defendants do not contest this assertion.

[8] By referring to the post-termination and post-expiration covenants "theoretically" being enforceable against the Defendants here, the Court means to convey that it is not opining at this juncture whether the post-expiration and post-termination non-competition covenants in the Franchise Agreements are actually *enforceable* against the Defendants under Tennessee state law—the state law that governs the Franchise Agreements. (Doc. No. 7-2 at § 20.10; Doc. No. 7-4 at § 20.10). Rather, the Court is merely noting that in the event such covenants are enforceable, then they will be enforceable against the Defendants in this action.

reasons described above. Therefore, the Court below will refer to these covenants collectively as the "Post-Termination Non-Competition Covenants"[9] and will not distinguish between (a) the post-expiration and post-termination non-competition covenants in the First Franchise Agreement and (b) the post-expiration and post-termination non-competition covenants in the Second Franchise Agreement.[10]

3. Factual Background

With the above background (and terminology) provided, the Court next provides a brief overview of the specific circumstances underlying the instant Motion.

The term of the First Franchise Agreement (entered into on October 23, 2013) was set to expire on October 23, 2023. (Doc. No. 7-1 at ¶ 7). Nevertheless, after October 23, 2023, Defendant Estes, Defendant Milley, and Plaintiff "continued operating as if [the First Franchise Agreement] remained in full force and effect beyond that date." (*Id.*). Around December 2024, Plaintiff sent a letter to Defendant Estes and Defendant Milley purporting to terminate the First Franchise Agreement. (Doc. No. 16-1 at 3).[11]

---

[9] For clarity, the Court notes that when it uses the term "Post-Termination Non-Competition Covenants" it is referring specifically to those provisions (discussed at-length above) of the Franchise Agreements at Docket No. 7-2 at §§ 11.3.2.1, 11.3.2.3 and Docket No. 7-4 at §§ 11.3.2.1, 11.3.2.3.

[10] The Court notes that there are other post-termination and post-expiration covenants in the Franchise Agreements (Doc. No. 7-2 at §§ 11.3.2.2, 11.3.2.4; Doc. No. 7-4 at §§ 11.3.2.2, 11.3.2.4) beyond those discussed just above and encompassed within the term "Post-Termination Non-Competition Covenants" as used by the Court herein. Plaintiff does not seem to assert breaches of these other provisions (Doc. No. 7-2 at §§ 11.3.2.2, 11.3.2.4; Doc. No. 7-4 at §§ 11.3.2.2, 11.3.2.4) in connection with the Motion, and accordingly the Court herein will not analyze these provisions. Thus, these other provisions are not included within the term "Post-Termination Non-Competition Covenants" as the Court uses the term herein.

[11] The Court declines to opine herein on whether the First Franchise Agreement was in fact terminated, given that it is unnecessary to the Court's decision on the instant Motion for the reasons described below.
For context, the Court notes that a copy of the December 2024 letter is filed at Docket No. 7-3.

Subsequently, in spring 2025, Plaintiff "began suspecting improper conduct by the Franchisee Defendants." (Doc. 7-1 at ¶ 11). Accordingly, Plaintiff "directed a third-party to observe activity at the Franchisee Defendants' Showhomes business." (*Id.* at ¶ 12). During this observation, Defendant Estes, Defendant Milley, and what the Declaration of Aurelio Salas describes as a "Mainline Home Staging truck," were "observed conducting competitive business at several residential properties." (*Id.* at ¶ 13). Plaintiff subsequently "discovered" additional (purported) competitive conduct on the part of the Franchisee Defendants, including the website of a business, Shore Points Home Staging, which identified Defendant Estes and Defendant Milley as that "business's principals" and that advertised "the services that the company provides to include home staging, styling, and design services, the very services offered by Showhomes franchisees." (*Id.* at ¶ 21).

As a result of the Franchisee Defendants' conduct—which was, according to Plaintiff, in violation of *in-term* (rather than the post-termination and post-expiration) non-compete provisions in the Second Franchise Agreement (Doc. No. 7-4 at §§ 11.3.1.1, 11.3.1.2)—on July 30, 2025 Plaintiff gave notice[12] (purporting) to terminate the Second Franchise Agreement. (Doc. No. 7-1 at ¶ 23; Doc. No. 16-1 at 4).[13] Plaintiff now contends that Defendants were and are operating a business (in violation of the Post-Termination Non-Competition Covenants (Doc. No. 7-2 at §§ 11.3.2.1, 11.3.2.3; Doc. No. 7-4 at §§ 11.3.2.1, 11.3.2.3)) "based on the training, know-how, and relationships that they acquired and developed as Showhomes franchises; indeed, [Defendants] are marketing their competing business based on that experience. Furthermore, Showhomes has reason

---

[12] A copy of the July 30, 2025 notice is filed at Docket No. 7-10.

[13] The Court declines to opine on whether the Second Franchise Agreement was in fact terminated herein, given that it is unnecessary to the Court's decision on the instant Motion for the reasons described below.

to believe the Defendants are diverting, or attempting to divert, and soliciting business and customers of their former franchised business." (Doc. No. 7-2 at ¶ 25). Plaintiff further contends that Defendants continue "to operate their competitive business out of the same location as their former Showhomes franchise, 32 N. Bacton Hill Road, in Malvern, Pennsylvania, and serve customers within the same territories as their former Showhomes franchises." (Doc. No. 21-1 at ¶ 8).

   4. Plaintiff's Motion and Defendants' Response

Plaintiff brings the instant Motion seeking to enjoin the continued (according to Plaintiff) "unfair and unlawful competition" of the Defendants (detailed just above). (Doc. No. 7 at 5). Plaintiff contends (though not explicitly)[14] that such conduct is in violation of the Post-Termination Non-Competition Covenants (Doc. No. 7-2 at §§ 11.3.2.1, 11.3.2.3; Doc. No. 7-4 at §§ 11.3.2.1, 11.3.2.3), and that Defendants' conduct "impairs [Plaintiff's] ability to refranchise the area in which the Franchisee Defendants formerly operated their Showhomes franchises and damages Showhomes' goodwill – the very things [that the] Franchise Agreements' covenants against competition were designed to protect against." (Doc. No. 7 at 12 (citing Doc. No. 7-1 at ¶¶ 24, 25)).

---

[14] Plaintiff does not state explicitly that it contends the Post-Termination Non-Competition Covenants (Doc. No. 7-2 at §§ 11.3.2.1, 11.3.2.3; Doc. No. 7-4 at §§ 11.3.2.1, 11.3.2.3) in particular are being violated by Defendants' conduct. Nonetheless, from the briefing on the Motion, the Court understands that it is the Post-Termination Non-Competition Covenants specifically (i.e., the provisions of the Franchise Agreements at Docket No. 7-2 at §§ 11.3.2.1, 11.3.2.3 and Docket No. 7-4 at §§ 11.3.2.1, 11.3.2.3 discussed above) that Plaintiff contends are being violated by Defendants' conduct. The Court's understanding is due not least to the fact that Plaintiff argues that "Showhomes must show that it is likely to prove that the Defendants have breached the Franchise Agreements' valid and enforceable *post-termination and post-expiration covenants against competition.*" (Doc. No. 7 at 13 (emphasis added)). And, although there are other post-termination and post-expiration covenants in the Franchise Agreements (Doc. No. 7-2 at §§ 11.3.2.2, 11.3.2.4; Doc. No. 7-4 at §§ 11.3.2.2, 11.3.2.4), Plaintiff does not seem to assert breaches of these *particular* provisions in connection with the Motion, and indeed never mentions these particular provisions in the briefing on the Motion.

In their response, Defendants contend that (1) Plaintiff cannot show imminent, irreparable harm, as required for a preliminary injunction to issue (Doc. No. 19 at 11-12); (2) Plaintiff is unlikely to succeed on the merits of its breach of contract claim (*id.* at 12-15); (3) the balance of equities tips in favor of Defendants (*id.* at 15-16); and (4) that issuing Plaintiff's requested preliminary injunction is against the public interest. (*Id.* at 16-17). Defendants also request that the Court hold an evidentiary hearing on the Motion. (*Id.* at 17).

Below, after first reviewing general legal standards for evaluating motions for preliminary injunctive relief, the Court will evaluate the parties' arguments with respect to the instant Motion.

## LEGAL STANDARD

Those seeking a preliminary injunction must meet four requirements.[15] They must show a likelihood of success on the merits; irreparable harm in the absence of the injunction; the balance

---

[15] Published Sixth Circuit case law stands unmistakably for the proposition that these four items are factors rather than requirements, except that irreparable harm is a requirement (and, if it exists and thus keeps the possibility of a preliminary injunction alive, thereafter becomes a factor to be balanced along with the other three factors). *See, e.g., D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019). Alas, this case law is inconsistent with other (including more recent) Sixth Circuit case law and with Supreme Court cases (including *Winter*) that describe these as all being requirements (i.e., things that *must* be established. *See, e.g., id.* at 328, 329 (Nabaldian, J., concurring) (noting that "[*Winter*]'s language seems clear—a plaintiff *must* establish the factors" and questioning "whether the balancing analysis itself aligns with *Winter*.").

Notably, other courts have likewise treated the four items as requirements (prerequisites), rather than as factors. *E.g., Southern Poverty Law Ctr. v. United States Dep't Homeland Sec.*, Civil Action No. 18-760 (CKK), 2020 WL 3265533, *10 (D.D.C. June 17, 2020); *Transatlantic, LLC v. Humana, Inc.*, 8:13–CV–1925–T–17TBM, 2013 WL 3958361, *1 (M.D. Fla. Aug. 1, 2013).

The Court believes that it needs to choose between the two approaches—even if the substance or the outcome of the Motion does not turn on such choice—because the approach does dictate how a court goes about explaining its analysis and decision on a motion for preliminary injunction. And the Court believes that it should follow the latter line of cases, i.e., those that treat the standard as involving requirements rather than factors.

First, explaining and applying the standard in terms of requirements is substantially more straightforward than the alternative—which is to explain that the four items are factors to be balanced, except that, well, that's only partially true because actually irreparable harm *is* a requirement (but also, if it exists, *then* a factor to be balanced along with the other factors) and likelihood of success (at least to some minimal extent) is also required. *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019) ("Thus, although the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory."); *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (noting that it is reversible error for a district court to issue a preliminary injunction "where there is

of equities favors them; and that the public interest favors an injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 403 (6th Cir. 2022).

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "The party seeking the preliminary injunction bears the burden of justifying such relief, including showing irreparable harm and likelihood of success." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012).

Plaintiffs seeking a preliminary injunction may not merely rely on unsupported allegations but rather must come forward with more than "scant evidence" to substantiate their allegations. *See, e.g., Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 417 (6th Cir. 2014); *McNeilly*, 684 F.3d at 614 (upholding denial of preliminary injunction when plaintiff made only a "small showing" of evidence); *Cameron v. Bouchard*, 815 F. App'x 978, 986 (6th Cir. 2020) (vacating preliminary injunction when plaintiffs made no evidentiary showing on some elements of their claim, but instead relied on mere allegations); *United States v. Certain Land Situated in City of*

---

simply no likelihood of success on the merits (quoting *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010))). Second, it is easier to articulate a conclusion as to whether requirements are satisfied (which is done in simple yes/no, or satisfied/unsatisfied, terms) than to articulate the outcome of some so-called "balancing" of (mismatched) factors. This is especially true given that case-specific balancing apparently is based in part on some inscrutable sliding scale of required likelihood of success on the merits that depends on the strength of the other three factors. *See, e.g., In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.1985) ("[T]he degree of likelihood of success required may depend on the strength of the other factors.").

The Court notes that herein it quotes some case law that refers to these items as "factors" and describes them in language that befits factors more than requirements—as for example by referring to the *issue* of *whether* issuing the injunction would harm others (factor-style language) rather than the *requirement* that the balance of equites favors the movant, or by referring to the issue of where the public interest lies (factor-style language) rather than the requirement that the public interest favors an injunction. In so doing, the Court is confident that the astute reader readily will be able to translate the factor-style language into the corresponding language of requirements for purposes of following the Court's analysis herein.

*Detroit*, No. 95-1118, 1996 WL 26915, at *1 n.1 (6th Cir. 1996) (affirming denial of a preliminary injunction where the district court relied on a lack of evidence to support speculative allegations); *Boulding v. Corr. Med. Servs.*, No. 1:06-CV-811, 2008 WL 2095390, at *1 (W.D. Mich. Feb. 11, 2008) ("Plaintiff did not marshal any evidence in support of his motion [for a preliminary injunction]. Plaintiff's unsupported allegations do not suffice."), *report and recommendation adopted*, 2008 WL 2095387 (W.D. Mich. May 15, 2008).[16]

## DISCUSSION

Here, the Court will rest its analysis of the instant Motion on the second of the four requirements for a preliminary injunction to issue: whether Plaintiff is likely to suffer irreparable harm in the absence of its requested injunction. As will be explained further below, it is on this requirement that Plaintiff's Motion founders.

---

[16] It is often stated that the decision whether to grant a preliminary injunction is a matter within the discretion of the district court. *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 447 (6th Cir. 2009). If that is the case, then it follows that the district court must have the discretion to grant or deny a preliminary injunction even if the movant has shown (by satisfaction of the four requirements) that it is at least *eligible* for a preliminary injunction. *See Doe v. Rausch*, No. 3:24-CV-01403, 2025 WL 57711, at *4 (M.D. Tenn. Jan. 9, 2025). This is because the district court obviously has no discretion to grant a preliminary injunction when the requirements for a preliminary injunction are *not* all satisfied; otherwise, those requirements would not actually be requirements at all. So the only context in which a district court could possibly have discretion when it comes to issuing or declining to issue a preliminary injunction is the context where the movant *has* satisfied all the requirements for a preliminary injunction.

The Court's conclusion that it has the discretion to deny a preliminary injunction even if the movant has shown it is eligible for a preliminary injunction is buttressed by caselaw from federal circuit courts (although not as yet the Sixth Circuit), as well as numerous other district courts. *See e.g., RJ's Int'l Trading, LLC v. Crown Castle S., LLC*, No. 23-10453, 2024 WL 1509156, at *2 (11th Cir. Apr. 8, 2024) ("Even in those cases where the requirements of a permanent injunction have been met, a court maintains broad discretion to deny permanent injunctive relief."); *Bethesda Softworks, L.L.C. v. Interplay Ent. Corp.*, 452 F. App'x 351, 353 (4th Cir. 2011) ("'whether to grant the injunction still remains in the 'equitable discretion' of the [district] court' even when a plaintiff has made the requisite showing." (quoting *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007))); *Franciscan All, Inc. v. Burwell*, 227 F. Supp.3d 660, 677 (N.D. Tex. 2016) (finding that even when the movant satisfies the four preliminary injunction factors, "the decision whether to grant or deny a preliminary injunction remains discretionary with the district court."). *See also Winter*, 555 U.S. at 32 ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course.").

To warrant preliminary injunctive relief, a plaintiff must show that it will likely suffer irreparable harm absent an injunction. *Winter*, 555 U.S. at 20. Irreparable harm must be "both certain and immediate," not "speculative or theoretical." *Nacco Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929, 943 (6th Cir. 2007) (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)). *See also Advoc. & Res. Corp. v. U.S. Dep't of Agric.*, No. 2:11-CV-00097, 2011 WL 4738250, at *8 (M.D. Tenn. Oct. 6, 2011) ("A plaintiff seeking injunctive relief must demonstrate that irreparable harm is likely in the absence of an injunction, not merely speculative."). The requirement that irreparable harm exist before issuing a preliminary injunction is crucial, because "[i]f the plaintiff isn't facing imminent and irreparable injury [absent the requested injunctive relief], there's no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d at 327.

As relevant here, district courts in this Circuit regularly find that "the loss of customer goodwill and fair competition can amount to irreparable harm." *Interstate S. Packaging, LLC v. Korman*, No. 2:20-CV-207, 2021 WL 5161910, at *14 (E.D. Tenn. Sept. 5, 2021) (citing *Basiccomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992)). And as this Court has previously noted, "[t]he loss of customer goodwill and injuries that are a consequence of unfair competition are difficult to compute and can constitute irreparable harm." *AmeriGas Propane, Inc. v. Crook*, 844 F. Supp. 379, 390 (M.D. Tenn. 1993). *See also I love Juice Bar Franchising, LLC v. ILJK Charlotte Juice, LLC*, No. 3:19-CV-00981, 2019 WL 6050283, at *12 (M.D. Tenn. Nov. 15, 2019) ("Tennessee courts have found that the breach of a covenant not to compete can cause irreparable damage."). Likewise, district courts in this Circuit have found irreparable harm when a franchisee breaches noncompete provisions in a franchise agreement, reasoning that if "franchisees were able to disregard their noncompete agreements with impunity, [the] entire business model [of the

franchiser] could be placed in jeopardy as franchisees would be able to depart and then immediately begin competing with [the franchisor] after having received its benefits and knowledge of its operations." *AmeriSpec, Inc. v. Psaris*, No. 09-2360, 2009 WL 10698732, at *3 (W.D. Tenn. Sept. 10, 2009). *See also ServiceMaster Residential/Com. Servs., L.P. v. Westchester Cleaning Servs., Inc.*, No. 01 CIV. 2229 (JSM), 2001 WL 396520 (S.D.N.Y. Apr. 19, 2001) (finding irreparable harm where "the franchise system [of the franchisor] itself [would be] endangered" if "a franchise is permitted to avoid its reasonable non-compete obligations.").

> Plaintiff argues that it is likely to suffer irreparable harm absent injunctive relief because:
>
> Defendants are using confidential information, training, know how, customer relationships, and goodwill developed over more than a decade as Showhomes franchisees to compete against Showhomes in the very territories in which Defendants previously operated their franchises, among other things, impeding Showhomes ability to refranchise the area, confusing customers, and harming the Showhomes brand. Courts regularly find that unfair competition and the loss of customer goodwill constitute irreparable harm, warranting injunctive relief. [ ]
>
> Furthermore, the harm caused by Defendants' blatant disregard for their contractual obligations is irreparable. As a court in this district put it: if a franchisor's "franchisees were able to disregard their noncompete agreements with impunity, [the franchisor's] entire business model could be placed in jeopardy as franchisees would be able to depart and then immediately begin competing with [the franchisor] after having received its benefits and knowledge of its operations." *Psaris*, 2009 WL 10698732, at *3; *see also Westchester Cleaning*, 2001 WL 396520, at *4 (finding irreparable harm by noting "the franchise system itself is endangered if a franchise is permitted to avoid its reasonable non-compete obligations." (citation omitted)); *Omni Enters.*, 2018 WL 2248459, at *7 (same). Here, Defendants began operating a competing business while they were still Showhomes franchisees, receiving all of the associated benefits. Sanctioning Defendants' conduct by permitting them to disregard their contractual obligations and unfairly compete against Showhomes and its franchisees would irreparably damage the integrity of the Showhomes system.

(Doc. No. 7 at 18-20). Defendants argue in their Response:

> . . . Plaintiff's showing of irreparable harm is wholly deficient. Rather than offering competent proof of actual and imminent harm, Plaintiff relies almost exclusively on case law reciting the general principle that franchisors may suffer irreparable harm when former franchisees operate competitive businesses. But Plaintiff

submits no affidavits identifying even a single customer allegedly lost, instance of confusion, or measurable diminution in goodwill. Courts routinely reject such unsupported assertions.

(Doc. No. 16 at 12). After reviewing these arguments, the Court concludes that Plaintiff has not shown the likelihood of irreparable harm necessary for a preliminary injunction to issue.

As an initial matter, the Court notes that for the purposes of its analysis of the irreparable harm requirement below, it is assuming *arguendo* that a breach (by Defendants) of the Post-Termination Non-Competition Covenants occurred, and that the Post-Termination Non-Competition Covenants are in fact enforceable under Tennessee law.[17]

That having been said, the Court next notes that Plaintiff's assertions that it will (or is likely to) suffer irreparable harm absent its requested injunctive relief are not actually supported by the record. Plaintiff asserts baldly that Defendants' conduct "imped[es] Showhomes ability to refranchise the area [where Defendants' are conducting the (purportedly) offending business], confusing customers, and harming the Showhomes brand." (Doc. No. 7 at 18). That these harms, if suffered by Plaintiff, would be irreparable is likely true given the case law just reviewed by the Court above. However, there is no citation to the record in support of Plaintiff's assertion that it is likely to suffer these harms. And the Court's independent review of the record—namely the two affidavits of Aurelio Salas submitted in connection with the Motion (Doc. No. 7-1; Doc. No. 21-1)—does not reveal sufficient evidence to show that these harms are *likely* to be suffered by Plaintiff as required for a preliminary injunction to issue. Rather, what these affidavits do show is some sort of nebulous concern that Defendants' conduct will harm Plaintiff, (Doc. No. 7-1 at ¶¶ 24-25), or that Defendants continue to run a business that is (purportedly) in violation of the Post-

---

[17] As noted in passing in a footnote above, Tennessee state law governs the Franchise Agreements. (Doc. No. 7-2 at § 20.10; Doc. No. 7-4 at § 20.10).

Termination Non-Competition Covenants and in competition with Plaintiff. (Doc. No. 21-1 at ¶ 8).

Likewise, Plaintiff's assertion that "[s]anctioning Defendants' conduct by permitting them to disregard their contractual obligations and unfairly compete against Showhomes and its franchisees would irreparably damage the integrity of the Showhomes system" (Doc. No. 7 at 20) is made without citation to the record, and the Court's independent review of the record does not show any support for the proposition that absent injunctive relief, it is *likely* that Plaintiff's business model would be irreparably damaged by permitting Defendants' challenged conduct to continue.

To put it another way, what is missing from the record is any indication that Plaintiff is "*likely* to suffer irreparable harm in the absence of preliminary relief," as is required for such relief. *Winter*, 555 U.S. at 20 (emphasis added).[18] Rather, and as Defendants argue in their Response, "Plaintiff relies almost exclusively on case law reciting the general principle that franchisors may suffer irreparable harm when former franchisees operate competitive businesses. But Plaintiff submits no affidavits identifying even a single customer allegedly lost, instance of confusion, or measurable diminution in goodwill." (Doc. No. 16 at 12). Taken together, although Plaintiff has listed harms that, if they did (or were likely to) occur, would be irreparable to Plaintiff, Plaintiff has not carried its burden to show that it is *likely* that it will in fact suffer those harms. This will

---

[18] Indeed, one of the only indications that Plaintiff has suffered tangible harm as a result of Defendants' conduct is from the spring of 2025 (when the Second Franchise Agreement was still—as is undisputed by the parties—in effect). At that time, Plaintiff contends that it observed "a significant decline in the Franchisee Defendants' reported sales to Showhomes" because of Defendants' conduct. (Doc. No. 7-1 at ¶ 11). But such past harm does little to avail Plaintiff in bringing the present Motion given that "[p]ast harm allows a plaintiff to seek damages, but it does not entitle a plaintiff to seek injunctive or declaratory relief . . . because the fact that a harm occurred in the past 'does nothing to establish a real and immediate threat that' it will occur in the future, as is required for injunctive relief." *Kanuszewski v. Michigan Dep't of Health & Human Servs.*, 927 F.3d 396, 406 (6th Cir. 2019) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983)).

not do, and as this Court (and indeed the Sixth Circuit) has noted time and again, a movant seeking a preliminary injunction must demonstrate that absent the requested injunctive relief, they will suffer harm that is "actual and imminent[,] rather than harm that is speculative or unsubstantiated." *Sorey v. Wilson Cnty. Book Rev. Comm.*, No. 3:23-CV-00181, 2023 WL 6795285, at *6 (M.D. Tenn. Oct. 13, 2023) (quoting *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006)). *See also Moms for Liberty - Wilson Cnty., Tennessee v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 514 (6th Cir. 2025) (finding that a plaintiff failed to make its showing of irreparable harm where it had "only shown speculative or potential harm.").[19]

In short, the Court concludes that Plaintiff has not satisfied one of the requirements for its requested preliminary injunctive relief: a demonstration that it is likely to suffer irreparable harm absent its requested injunctive relief. Therefore, the Court need not and will not analyze whether

---

[19] To the extent that Plaintiff means to argue that by merely demonstrating a breach of the Post-Termination Non-Competition Covenants by Defendants—in showing that Defendants' are running a business in such a manner as to be in violation of the Post-Termination Non-Competition Covenants (as the Court assumes has occurred for the purposes of its analysis herein)—such violation alone is sufficient to show that it is likely Plaintiff would suffer irreparable harm so as to justify the issuance of a preliminary injunction, Plaintiff cites no case law in support of this proposition and the Court rejects this view. Although Tennessee state case law (the state law which governs the Franchise Agreements) on this particular question is scare (and the Court was unable to locate a Tennessee state court decision addressing this question directly), the Court's view on this subject is buttressed by the Sixth Circuit. In *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964 (6th Cir. 2002), the Sixth Circuit (albeit in an unreported opinion applying Ohio state law) rejected the view that a non-compete agreement containing a "stipulation that any violation of the agreement would create irreparable harm" was sufficient, without more, to show that the party seeking a preliminary injunction was likely to suffer irreparable harm, noting that injury "must be proved." *Id.* at 970. It follows from *Patio* that a violation of a non-compete provision *not* containing a stipulation that any violation of said provision would constitute irreparable harm (like the Post-Termination Non-Competition Covenants at-issue in this case) would not, on its own be sufficient to show a likelihood that a party would suffer irreparable harm absent the requested injunctive relief. *Cf. JTH Tax, LLC v. Agnant*, 62 F.4th 658, 673 (2d Cir. 2023) ("There is thus no 'automatic assumption' that 'irreparable harm must inevitably be assumed in breach of covenant [not to compete] cases.'" (quoting *Baker's Aid, Inc. v. Hussmann Foodservice Co.*, 830 F.2d 13, 15 (2d Cir. 1987))).

The Court also notes for clarity that although there is some Sixth Circuit case law providing "that no particular finding of likelihood of entry or irreparable harm is necessary for injunctive relief in trademark infringement or unfair competition cases," such case law is in the context of violations of the Lanham Act (a federal statute governing trademarks) and similar state laws, rendering it plainly inapplicable to the instant case. *Cir. City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999) (quoting *Wynn Oil Co. v. American Way Serv. Corp.*, 943 F.2d 595, 608 (6th Cir.1991)).

Plaintiff has satisfied any of the three remaining preliminary injunction requirements given that the Court's finding with respect to any of these other requirements would not unsettle the Court's ultimate conclusion that the Motion must be denied. *See Jones v. City of Monroe, MI*, 314 F.3d 474, 476 (6th Cir. 2003) ("a district court is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issue").[20]

## CONCLUSION

Accordingly, for the reasons stated herein, Plaintiff's Motion (Doc. No. 6) is **DENIED**.[21] All other outstanding motions in this matter remain pending.

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[20] Notably, although *Jones* calls the four items "factors" rather than "requirements," it plainly was treating the items as if they could function as *requirements*, inasmuch as it indicates that fewer than all of them (and, for all *Jones* indicates, the absence of even a *single one* of them) could be dispositive.

[21] Given that the Court has determined that it can rule on the Motion based on the parties' briefing (and has so ruled on the Motion herein), Defendants' request for a hearing on the Motion is denied.

Likewise, the Court will not grant either side's request for an award of attorneys' fees in connection with the Motion. Naturally, the Court will not grant Plaintiff's request for attorneys' fees (located in Plaintiff's proposed order (Doc. No. 7-11) filed with the Motion) given that it is denying the Motion. Likewise, the Court will deny Defendants' request for fees (Doc. No. 16 at 18) given that it is unsupported by any authority or argument.